IN THE COURT OF APPEALS OF NORTH CAROLINA

 2022-NCCOA-32

 No. COA20-867

 Filed 18 January 2022

North Carolina Utilities Commission, No. EMP-105, SUB 0

STATE OF NORTH CAROLINA EX. REL. UTILITIES COMMISSION; PUBLIC
STAFF-NORTH CAROLINA UTILITIES COMMISSION, Appellees,
 v.

FRIESIAN HOLDINGS, LLC, Petitioner; NORTH CAROLINA SUSTAINABLE
ENERGY ASSOCIATION, Intervenor; and NORTH CAROLINA CLEAN ENERGY
BUSINESS ALLIANCE, Intervenor, Appellants,
 v.

DUKE ENERGY PROGRESS, LLC and NORTH CAROLINA ELECTRIC
MEMBERSHIP CORPORATION, Intervenors.

 Appeal by Petitioner and Intervenor-Appellants from order entered 11 June

2020 by the North Carolina Utilities Commission. Heard in the Court of Appeals 21

September 2021.

 Fox Rothschild LLP, by Karen M. Kemerait, and Kilpatrick, Townsend &
 Stockton LLP, by Steven J. Levitas, Benjamin L. Snowden, and Adam H.
 Charnes, for Petitioner-Appellant.

 Layla Cummings, Dianna W. Downey, and Robert B. Josey, Jr., for Appellee
 Public Staff-North Carolina Utilities Commission.

 Benjamin W. Smith and Peter H. Ledford for Intervenor-Appellant North
 Carolina Sustainable Energy Association.

 Adam Foodman and John D. Burns for Intervenor-Appellant North Carolina
 Clean Energy Business Alliance.
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 Nexsen Pruet PLLC, by David P. Ferrell, and Richard M. Feathers and Michael
 D. Youth, for Intervenor-Appellee North Carolina Electric Membership
 Corporation.

 Jack E. Jirak for Intervenor Duke Energy Progress, LLC.

 INMAN, Judge.

¶1 North Carolina has made significant strides in generating and employing

 alternatives to carbon-emitting fuels. We rank fourth in the nation in solar

 installations, with solar making up nearly eight percent of our state’s electricity.1

 Our legislature has enacted clean energy goals including a 70 percent reduction in

 carbon emissions by the year 2030 and carbon neutrality by 2050.2 The southeastern

 region of the state, in particular, has attracted several solar energy facilities.3 But

 growing production has strained the region’s existing electric grid. A dispute over

 the cost and timing of upgrading the grid gives rise to this appeal.

¶2 Unlike other industrial and commercial enterprises, energy generation

 1 Solar Energy Industries Association (SEIA), State Solar Spotlight: North Carolina

 Solar, (Sept. 24, 2021), https://www.seia.org/sites/default/files/2021-09/North Carolina.pdf.
 2 See An Act to Authorize the Utilities Commission, S.L. 2021-951, § 1,

 https://www.ncleg.gov/Sessions/2021/Bills/House/PDF/H951v5.pdf.
 3 In its order, the North Carolina Utilities Commission concluded, “[N]o party disputes

 that southeastern North Carolina exhibits many attributes favorable for the development of
 solar generating facilities and that those attributes have resulted in significant solar
 development in that region. As a result, however, the transmission infrastructure in that
 portion of the [Duke] system is approaching a tipping point where additional generation in
 certain portions of the system will require significant upgrades to the network.”
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 facilities can operate only as permitted by the North Carolina Utilities Commission

 (“the Commission”). N.C. Gen. Stat. § 62-110.1(a) (2019). This system of regulation

 is analogous to state law limiting medical facilities to providers who have obtained a

 certificate of need from the Department of Health and Human Services. See N.C.

 Gen. Stat. § 131E-175(7) (2019). Energy plants cannot spring up like many

 restaurants, fitness centers, or dry cleaners, even if consumer demand would support

 the increased supply. In this way, government regulation influences the energy

 market.

¶3 Petitioner-Appellant Friesian Holdings, LLC (“Friesian”), an independent

 energy company, seeks to generate additional solar energy in the southeast. Friesian

 applied to the Commission for a certificate of public convenience and necessity

 (“CPCN” or “certificate”) to build and operate a solar energy plant, which would sell

 and distribute electricity through an existing electric grid. Citing the cost of

 upgrading the region’s electric grid to accommodate additional transmission, the

 Commission denied Friesian’s application. Friesian appeals, contending that the

 Commission’s decision unfairly favors larger energy utilities and squelches

 competition, to the detriment of consumers.

¶4 Friesian presents three arguments on appeal: (1) federal law aimed at fostering

 free competition preempts the Commission’s decision; (2) the Commission’s cost

 analysis was unsupported by the evidence and was arbitrary and capricious; and (3)
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 the Commission erred in concluding Friesian did not demonstrate a need for its

 facility. After careful review of the record and our precedent, we affirm the

 Commission.

 I. FACTS & PROCEDURAL HISTORY

¶5 This appeal arises from Friesian’s second application to the Commission to

 build and operate a solar energy plant. As explained below, Friesian’s first

 application was successful, but Friesian amended its energy distribution plan,

 leading to the application process we now review.

¶6 On 9 September 2016, Friesian filed its first application with the Commission

 seeking a CPCN to construct a 70-MWAC solar photovoltaic electric generation

 facility (“the facility”) in Scotland County. Pursuant to Commission Rule R8-64,

 Friesian classified itself as a small power producer or “qualifying facility,” intending

 to sell the energy produced by its facility to the public utility Duke Energy Progress

 (“Duke”) which owns and operates the energy grid servicing Scotland County. At the

 time of its application, Friesian had obtained most of the other federal and state

 permits required of them and planned to begin construction in early 2023 with

 commercial operation by December of the same year. The project did not generate

 any opposition from local residents or other interested parties. On 7 November 2016,

 the Commission granted Friesian a CPCN.

¶7 The Commission’s policies for state generator interconnections assign directly
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 to the qualifying facility––also known as the “interconnection customer,” here

 Friesian––the cost of upgrades to the grid necessary to connect to the qualifying

 facility. See Order Approving Revised Interconnection Standard, In the Matter of

 Petition for Approval of Revisions to Generator Interconnection Standards, State of

 North Carolina Utilities Commission, Docket No. E-100, Sub 101 (May 5, 2015).

¶8 On 2 August 2018, Friesian filed a request with the Commission to amend the

 CPCN previously issued for its facility to file as a different type of energy facility so

 that it could sell energy to a third-party energy distributor. Friesian’s proposed

 facility would still have to interconnect with the electric grid owned and operated by

 Duke. Because the amount of electricity already transmitted through the grid is

 approaching its current maximum capacity, the grid must be upgraded to

 accommodate Friesian’s additional energy supply.

¶9 On 15 May 2019, Friesian requested the Commission (1) allow Friesian to

 withdraw the requested amendment and (2) consider a new application for a CPCN

 as a “merchant plant” pursuant to Commission Rule R8-63 for the same facility. The

 Commission treated Friesian’s filing as a request to cancel the previously issued

 CPCN. The Commission allowed withdrawal of the requested amendment, cancelled

 the previously issued CPCN, and closed the docket on 14 June 2019.

¶ 10 On 6 June 2019, Friesian and Duke entered into a large generator

 interconnection agreement defining the parties’ respective obligations for
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 constructing and upgrading existing systems to accommodate the new facility. The

 necessary upgrade is estimated to require reconstruction of roughly 73 miles of the

 existing grid at a cost of $223.5 million plus $25 million in interest.4 The

 interconnection agreement requires Friesian to bear sole responsibility for $100

 million in estimated construction costs and another $4 million to interconnect the old

 and new facilities. However, a crediting policy provided by the Federal Energy

 Regulatory Commission (“FERC”) to level the playing field between large public

 utility companies and independent energy producers requires Duke to reimburse

 Friesian for the upgrade costs, in full, by passing along those costs in higher rates

 charged to its wholesale and North Carolina retail customers.5

¶ 11 On 14 June 2019, eight days after entering into the agreement with Duke,

 Friesian executed a purchase power agreement (“PPA”) with North Carolina Electric

 Membership Corporation (“NCEMC”)6 providing that Friesian would sell all the

 power and renewable energy credits generated by its facility to NCEMC. Duke would

 4 The Commission described these costs as “far and away [ ] the single costliest
 transmission project in North Carolina in recent times, perhaps the most expensive ever.”
 5 These costs were calculated by Duke pursuant to the Open Access Transmission

 Tariff it filed with FERC.
 6 NCEMC is “one of the largest generation and transmission electric cooperatives in

 the nation, providing reliable, affordable electricity to its 25 member cooperatives. NCEMC
 owns power generation assets, purchases electricity through contracts, identifies innovative
 energy projects and coordinates transmission resources for its members.” N.C. Electric
 Cooperatives, Who We Are: About Us, (last visited Oct. 28, 2021)
 https://www.ncelectriccooperatives.com/who-we-are/#about-us.
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 distribute the energy produced by the facility to NCEMC on a wholesale basis. FERC

 maintains jurisdiction over generating facilities’ wholesale distribution rates. See

 Miss. Power & Light Co. v. Miss. ex rel. Moore, 487 U.S. 354, 374, 101 L. Ed. 2d 322,

 340 (1988).

¶ 12 Friesian’s arrangements with Duke and NCEMC changed the regulatory

 classification of its facility to a “merchant plant,” so Friesian filed a second petition

 with the Commission for a CPCN as a “merchant plant.” A “merchant plant” is “an

 electric generating facility . . . the output of which will be sold exclusively at

 wholesale[.]” Commission Rule R8-63(a)(2) (emphasis added). Duke, NCEMC, the

 North Carolina Sustainable Energy Association (“NCSEA”), and the North Carolina

 Clean Energy Business Alliance (“NCCEBA”) petitioned to intervene in Friesian’s

 certificate application proceeding. The Commission allowed those petitions. The

 Public Staff of the Commission (“Public Staff”), an independent agency charged with

 representing the interests of consumers,7 also participated in the application process.

¶ 13 The Public Staff filed a motion asking the Commission to determine, among

 other legal questions:

 [w]hether the Commission has authority under state and
 federal law to consider as part of its review of the CPCN
 application the costs associated with the approximately

 7 By its own account, the “[Public Staff] is an independent agency not subject to the

 supervision, direction, or control of [the Commission]. The Public Staff represents the
 interests of the using and consuming public.”
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 $227 million dollars in transmission network upgrades and
 interconnection facilities necessary to accommodate the
 FERC-jurisdictional interconnection of the merchant
 generating facility, and the resulting impact of those
 network costs on retail rates in North Carolina[.]

 Following briefing and arguments, the Commission entered an interlocutory order

 determining it could consider the upgrade costs pursuant to our General Statutes and

 its own rules. See § 62-110.1; Commission Rule R8-63.

¶ 14 In its second certificate application and before the Commission, Friesian

 presented evidence of potential benefits that could stem from its facility and the

 associated grid updates, including: (1) the interconnection of multiple gigawatts of

 new renewable generation in North Carolina and South Carolina; (2) expansion of

 the grid capacity so that other solar facilities in Duke’s queue could be added in the

 future without additional upgrades; (3) the public would bear less of the upgrade costs

 compared to an alterative cost allocation under one of Duke’s planned projects; and

 (4) additional solar energy generation would help bring Duke closer to its target clean

 energy goals.

¶ 15 The Public Staff challenged that evidence and argued against issuance of a

 CPCN. Witnesses for the Public Staff testified, and one of Friesian’s witnesses

 conceded, that the facility would do little to supplement Duke’s solar energy supply
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 during the peak winter season,8 and that Duke had not previously identified the

 transmission lines in question as needing upgrades due to reliability issues.

¶ 16 On 11 June 2020, the Commission entered an order denying Friesian’s

 application, based on extensive findings. The Commission concluded Friesian’s

 generating facility project was not in the public convenience or need in part because

 the network upgrade costs, to be passed on to the ratepayers under FERC’s crediting

 policy, were unreasonably high. Before its decision denying Friesian’s application,

 the Commission had never before denied a CPCN to an energy generator that had

 entered into a PPA. Friesian timely appealed the Commission’s order.

 II. ANALYSIS

¶ 17 We review Utility Commission decisions to determine:

 if substantial rights of the appellants have been prejudiced
 because the Commission’s findings, inferences, conclusions
 or decisions are
 (1) In violation of constitutional provisions, or
 (2) In excess of statutory authority or jurisdiction of
 the Commission, or
 (3) Made up on unlawful proceedings, or
 (4) Affected by other errors of law, or
 (5) Unsupported by competent, material and
 substantial evidence in view of the entire record as
 submitted, or
 (6) Arbitrary or capricious.

 8 While Duke’s energy resource plans demonstrate a need for additional capacity to

 meet the grid’s winter peak loads, the addition of a solar facility, by its nature, could not
 provide the type of reliable or controlled additional power generation required during the
 winter season because of shorter days and less sunlight.
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 N.C. Gen. Stat. § 62-94(b) (2019). A decision by the Commission is arbitrary and

 capricious if it “lack[s] fair and careful consideration or fail[s] to display a reasoned

 judgment.” State ex rel. Utils. Comm’n v. Carolina Water Serv., Inc. of N.C., 225 N.C.

 App. 120, 130, 738 S.E.2d 187, 195 (2013).

¶ 18 On appeal, “any rule, regulation, finding, determination, or order made by the

 Commission . . . shall be prima facie just and reasonable.” § 62-94(e). “[W]here there

 is substantial evidence supporting the Commission’s findings and conclusions, we will

 not second guess the Commission’s determination.” In re Duke Energy Corp., 232

 N.C. App. 573, 586, 755 S.E.2d 382, 390 (2014). We review the Commission’s

 conclusions of law de novo. State ex rel. Utils. Comm’n v. Stein, 375 N.C. 870, 900,

 851 S.E.2d 237, 256 (2020). When the issue on appeal concerns interpreting a statute,

 the interpretation of a statute by an agency created to
 administer that statute is traditionally accorded some
 deference by appellate courts, [but] those interpretations
 are not binding. ‘The weight of such [an interpretation] in
 a particular case will depend upon the thoroughness
 evident in its consideration, the validity of its reasoning,
 its consistency with earlier and later pronouncements, and
 all those factors which give it power to persuade, if lacking
 power to control.’

 In re N.C. Sav. & Loan League v. N.C. Credit Union Comm’n, 302 N.C. 458, 466, 276

 S.E.2d 404, 410 (1981) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 89 L. Ed.

 124, 129 (1944)).
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

¶ 19 The Commission’s CPCN standard “is a relative or elastic theory rather than

 an abstract or absolute rule. The facts in each case must be separately considered[.]”

 State ex rel. N.C. Utils. Comm’n v. Casey, 245 N.C. 297, 302, 96 S.E.2d 8, 12 (1957)

 (citations omitted).

 A. The Commission’s Decision Is Not Preempted by Federal Law

¶ 20 Friesian contends the Commission’s denial of its CPCN was preempted by

 federal law because the Commission based its decision, in large part, on the upgrade

 costs that would be charged to ratepayers as required by FERC’s crediting policy.

 After careful review, we disagree.

¶ 21 Federal law may preempt state law or action in three distinct ways. First,

 Congress may expressly preempt state action through legislation. Pac. Gas & Elec.

 Co. v. State Energy Res. Conservation & Dev. Comm’n, 461 U.S. 190, 203, 75 L. Ed.

 2d. 752, 765 (1983). In the absence of express preemption, “the scheme of federal

 regulation may be so pervasive as to make reasonable the inference that Congress

 left no room for the States to supplement it.” Rice v. Santa Fe Elevator Corp., 331

 U.S. 218, 230, 91 L. Ed. 1447, 1459 (1947) (citations omitted). Third, state law or

 action is preempted where it directly conflicts with federal law, such that it makes

 compliance with both federal and state law impossible, or “stands as an obstacle to

 the accomplishment and execution of the full purposes and objectives of Congress.”

 Pac. Gas & Elec. Co., 461 U.S. at 204, 75 L. Ed. 2d at 765 (citations omitted). Friesian
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 asserts that the Commission’s order is preempted because it stands in the way of

 FERC’s policy of preventing discrimination by incumbent energy producers––like

 Duke––against smaller, independent producers seeking to enter the energy market.

¶ 22 The Federal Power Act (“FPA”) assigns FERC exclusive jurisdiction over the

 transmission of energy in interstate commerce and over the rates for wholesale

 transactions. 16 U.S.C. § 824(b)(1) (2018); see also State ex rel. Utils. Comm’n v.

 Carolina Power & Light Co., 161 N.C. App. 199, 203, 588 S.E.2d 77, 80 (2003), rev’d

 on other grounds, 359 N.C. 516, 614 S.E.2d 281 (2005). FERC is responsible for

 ensuring that the rates charged by utilities within its jurisdiction are “just and

 reasonable.” § 824d(a); see also Hughes v. Talen Energy Mktg., LLC, 578 U.S. 150,

 154, 194 L. Ed. 2d 414, 419 (2016).

¶ 23 On the other hand, the FPA “places beyond FERC’s power, and leaves to the

 States alone, the regulation of ‘any other sale’—most notably, any retail sale—of

 electricity.” Hughes, 578 U.S. at 154, 194 L. Ed. 2d at 420 (quoting FERC v. Elec.

 Power Supply Assn., 577 U.S. 260, 265, 193 L.Ed.2d 661, 667 (2016) and § 824(b)).

 For example, state utilities commissions, rather than FERC, determine the level of

 consumer need for power and the siting of a necessary facility. Pac. Gas & Elec. Co.,

 461 U.S. at 205-06, 75 L. Ed. 2d at 766 (“Need for new power facilities, their economic

 feasibility, and rates and services, are areas that have been characteristically

 governed by the States.”).
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

¶ 24 Friesian’s wholesale agreements with Duke and NCEMC trigger FERC

 jurisdiction over the interconnection of the systems. As noted above, the FPA

 provides: “All rates and charges made, demanded, or received by any public utility

 for or in connection with the transmission or sale of electric energy subject to the

 jurisdiction of [FERC], and all rules and regulations affecting or pertaining to such

 rates or charges shall be just and reasonable[.]” § 824d(a). FERC must remedy rates,

 charges, and other practices which are “unduly discriminatory or preferential.”

 § 824e(a).

¶ 25 Pursuant to this authority, FERC issued the “Crediting Policy” in Order No.

 2003 to establish standard procedures and pro forma agreements for the

 interconnection of generating facilities to transmission grids. Standardization of

 Generator Interconnection Agreements and Procedures, 68 Fed. Reg. 49,846 (Aug. 19,

 2003) (codified at 18 C.F.R. 35). Order No. 2003 found that utilities owning or

 controlling transmission grids have strong incentives to preclude independent

 generators from accessing the grid and have engaged in discriminatory practices in

 the past. Id. ¶ 19. The crediting policy was intended to serve the following goals: (1)

 limit opportunities for transmission providers to favor their own generation; (2)

 facilitate market entry for generation competitors; (3) encourage “needed investment

 in generator and transmission infrastructure;” (4) ensure interconnection customers’

 interconnections are treated comparably to the interconnections that a non-
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 independent transmission provider makes with its own generating facilities; and (5)

 “enhance competition in bulk power markets by promoting the construction of new

 generation, particularly in areas where entry barriers due to unduly discriminatory

 transmission practices may still be significant.” Id. ¶¶ 12, 694.

¶ 26 Our General Statutes provide:

 [N]o public utility or other person shall begin the
 construction of any steam, water, or other facility for the
 generation of electricity to be directly or indirectly used for
 the furnishing of public utility service . . . without first
 obtaining from the Commission a certificate that public
 convenience and necessity requires, or will require, such
 construction.

 § 62-110.1(a). Along with concerns like benefit to the public and the life of the

 facilities, the Commission may also consider the total costs of construction including

 those to construct the generating facility, to interconnect facilities, and to upgrade

 the existing network. § 62-110.1(e); Commission Rule R8-63.

¶ 27 Because the Commission has the sole authority to determine the need for new

 energy generation in North Carolina pursuant to Section 62-110.1, a power reserved

 for the states by Congress under the FPA, we hold the Commission’s decision to deny

 Friesian’s CPCN is not preempted by federal law. See State ex rel. Utils. Comm’n v.

 Carolina Power & Light Co., 359 N.C. 516, 529, 614 S.E.2d 281, 289 (2005) (holding

 the Commission’s decision was not preempted because the Commission “[wa]s not

 claiming . . . the authority to overrule or second-guess an agreement filed with or
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 approved by FERC and subject to FERC’s jurisdiction” and it was not “attempting to

 set rates in a wholesale agreement”). Further, our review of the record reveals that

 the Commission’s decision to deny Friesian’s application does not “stand[ ] as an

 obstacle” to FERC’s crediting policy goals. See Pac. Gas & Elec. Co., 461 U.S. at 204,

 75 L. Ed. 2d. at 765 (outlining that state law is preempted by federal law when it

 “stands as an obstacle to the accomplishment and execution of the full purposes and

 objectives of Congress”) (citations omitted)). Friesian has failed to cite, and we cannot

 find, any precedent precluding a state from considering the cost of required network

 upgrades in a siting determination.

¶ 28 The United States Supreme Court has made clear that states may not interfere

 with FERC-regulated interstate wholesale rates. See Nantahala Power & Light Co.

 v. Thornburg, 476 U.S. 953, 966, 90 L. Ed. 2d 943, 954 (1986) (“Once FERC sets such

 a rate, a State may not conclude in setting retail rates that the FERC-approved

 wholesale rates are unreasonable. A State must rather give effect to Congress’ desire

 to give FERC plenary authority over interstate wholesale rates, and to ensure that

 the States do not interfere with this authority.”); Miss. Power & Light Co., 487 U.S.

 at 374, 101 L. Ed. 2d at 340 (“Congress has drawn a bright line between state and

 federal authority in the setting of wholesale rates and in the regulation of agreements

 that affect wholesale rates. States may not regulate in areas where FERC has

 properly exercised its jurisdiction to determine just and reasonable wholesale rates
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 or to insure that agreements affecting wholesale rates are reasonable.”). Yet nothing

 in the FPA precludes states from considering the cost of network upgrades in the

 preliminary determination of the most cost-effective location for a generating facility

 or whether energy generation is in the public convenience and need for its residents.

¶ 29 In this case, FERC has not yet allocated costs related to energy to be generated

 by Friesian’s proposed facility. FERC has no authority to order, directly or otherwise,

 that Friesian’s facility be constructed, that it be sited in a particular part of the state,

 or that its energy be sold to a certain purchaser. The Commission is empowered to

 make the siting decision of whether and where an energy generating facility can be

 constructed. FERC then has control over wholesale rates. The Commission’s

 authority to make siting decisions is unaffected by FERC’s jurisdiction. Surely, the

 Commission would be preempted from attempting to alter the cost allocation set by

 FERC after it approved a site and after parties had incurred costs. But that was not

 the sequence of events in this case.

¶ 30 We agree with Friesian that if Duke itself generates additional energy in the

 southeast that requires upgrading the grid, the Commission could not prohibit Duke

 from passing 100 percent of grid update costs to its ratepayers pursuant to FERC’s

 crediting policy, costing consumers more than if they purchased energy generated by

 Friesian. See Nantahala Power & Light Co., 476 U.S. at 964-67, 970, 90 L. Ed. 2d at

 952-55, 957. However, the Commission’s order reflects that it did not deny Friesian’s
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 second application merely because upgrade costs would be passed along to the public.

 Instead, the Commission compared the unprecedented magnitude of upgrade costs to

 be borne by ratepayers to accommodate Friesian’s proposed facility with the facility’s

 expected output, and concluded they were too burdensome to be in the public

 convenience. So, we hold that in denying Friesian’s application, the Commission did

 not usurp or alter FERC’s crediting policy.

¶ 31 We acknowledge, as Friesian asserts, that the interconnection and upgrade

 process is ripe for discrimination by incumbents like Duke because of the economic

 incentive to favor its own generating facilities and disadvantage independent power

 producers. However, Friesian’s generating plant was not the target of FERC’s

 crediting policy in this circumstance and the Commission’s denial of Friesian’s

 application does not threaten FERC’s comprehensive federal regulatory scheme. See

 Pac. Gas & Elec. Co., 461 U.S. at 204, 75 L. Ed. 2d. at 765. Cf. Nat’l Ass’n of

 Regulatory Util. Comm’rs v. FERC, 964 F.3d 1177, 1188 (D.C. Cir. 2020) (“A State’s

 regulations aimed directly at matters in FERC’s jurisdiction cannot be sustained

 when they threaten the achievement of the comprehensive scheme of federal

 regulation.”) (cleaned up)). That is because Friesian’s entry into the energy market

 did not depend upon FERC’s crediting policy.

¶ 32 Friesian was already a participant in the energy market, prepared to pay

 construction and upgrade costs as a qualifying facility. It then sought to take
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 advantage of the cost allocation required under FERC’s crediting policy by

 contracting with NCEMC. Under this arrangement, Duke would distribute the

 energy generated by Friesian’s facility wholesale to NCEMC. As a result of the

 wholesale contract, Friesian re-classified itself as a merchant plant with the

 Commission. Absent this change in classification, Friesian already had a CPCN in

 hand and was permitted to build and operate its facility. For this reason, we conclude

 the Commission’s denial of Friesian’s second application does not frustrate FERC’s

 policy goal to prevent discrimination in competition by an incumbent against a new

 provider.

¶ 33 We hold federal law does not preempt the Commission’s denial of Friesian’s

 application because it did not “interfere with FERC’s authority by disregarding

 interstate wholesale rates.” Hughes, 578 U.S. at 165, 194 L. Ed. 2d at 427 (emphasis

 added).

 B. The Commission’s Cost Analysis

¶ 34 Second, Friesian argues the Commission’s denial of its CPCN was arbitrary

 and capricious and unsupported by substantial evidence because the Commission did

 not consider “additional generation resources that the upgrades would facilitate.”

¶ 35 As part of its need determination, the Commission adopted the levelized cost

 of transmission (“LCOT”) test to evaluate “the reasonableness of the network upgrade
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 costs associated with interconnecting a new generating facility.”9 The LCOT is

 “calculated by dividing the annualized cost of the required new transmission assets

 over the typical transmission asset lifetime by the expected annual generator output

 in [megawatt hour].”

¶ 36 At the hearing on its application, Friesian introduced evidence that the

 network upgrades would “facilitate the interconnection of 1,500 megawatts of

 additional generation in the Carolinas.” Duke introduced evidence that the network

 upgrades would allow for greater interconnection in its southeastern service territory,

 alleviate any “queue paralysis” and delays in future interconnection, and minimize

 challenges in its own interconnection study process.

¶ 37 In its cost analysis, the Commission accounted only for the planned output

 from Friesian’s facility, not the potential output from future electricity generation by

 other facilities that would use the upgraded grid. Based on the narrowed

 consideration, Friesian’s upgrades were assigned an LCOT value of $62.94 per

 megawatt hour (“MWh”) as opposed to between $1.56/MWh and $3.22/MWh for

 comparable nationwide solar network upgrades. Friesian’s LCOT value was

 significantly higher than the LCOT values for two other generators in the state, both

 9 We note that Friesian challenged the propriety of this test before the Commission

 but “would accept an appropriate LCOT test for the purpose of evaluating the public
 convenience of the Friesian Facility in light of the Network Upgrade costs.”
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 of which have received CPCNs from the Commission, at $0.33/MWh and $0.92/MWh.

¶ 38 Friesian asserts that if the Commission had weighed the potential future

 electricity generation created by the network upgrades, its upgrade figures would be

 much more comparable to benchmark LCOT numbers. But the record reflects that

 the Commission did, in fact, carefully consider and weigh the potential for additional

 energy generation. Rather than disregard that consideration outright, the

 Commission determined it was too speculative to support the approval of Friesian’s

 CPCN. The Commission explained that the LCOT analysis provides a benchmark of

 reasonableness of the upgrades relative to other similar transmission investments,

 but it is not a determinative test upon which the Commission could solely base its

 CPCN decision. In its discretion, the Commission concluded that the potential

 additional generation was subject to many variables and “there is nothing in the

 record to conclude that any of the proposed generating facilities, much less all of

 them, will actually be constructed and placed into service.” Friesian cites no

 authority supporting its argument that the Commission was required to consider

 potential future generation. Nor does Friesian offer any reason for this Court to

 deviate from the deferential standard of review applicable to any discretionary

 decision by the Commission. See § 62-94(e) (“[A] rule, regulation, finding,

 determination, or order made by the Commission . . . shall be prima facie just and

 reasonable.”); N.C. Sav. & Loan League, 302 N.C. at 466, 276 S.E.2d at 410 (“[T]he
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 interpretation of a statute by an agency created to administer that statute is

 traditionally accorded some deference by appellate courts[.]”).

¶ 39 Considering the record and the Commission’s exercise of its discretion in a fact-

 specific analysis, we cannot conclude the Commission’s cost calculation was arbitrary

 and capricious, lacked “fair and careful consideration,” or “failed to display reasoned

 judgment.” State ex rel. Utils. Comm’n, 225 N.C. App. at 130, 738 S.E.2d at 194.

¶ 40 NCSEA and NCCEBA, as intervenors, further contend that the Commission

 could not implement this LCOT analysis for the first time in its consideration of

 Friesian’s application without conducting rulemaking procedures including public

 notice and request for public comment. The LCOT analysis is not mandated by

 statute or Commission Rule for a CPCN application. See § 62-110.1; Commission R8-

 63. However, NCSEA and NCCEBA concede that the Commission is exempt from

 North Carolina’s Administrative Procedures Act, N.C. Gen. Stat. § 150B-1(c)(3)

 (2019), so formal notice-and-comment rulemaking requirements do not generally

 apply to Commission policies. These intervenors have not cited, and we have not

 found, authority prohibiting the Commission from employing the LCOT analysis to

 the CPCN application process absent a rulemaking procedure.

¶ 41 For these reasons, we hold the Commission did not err by employing the LCOT

 analysis in its need determination.
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 C. The Commission Did Not Err in Concluding Friesian Did Not
 Demonstrate Public Need

¶ 42 Friesian contends the Commission’s conclusion that Friesian failed to

 demonstrate a need for the solar electric plant was arbitrary and capricious because

 Friesian presented evidence of an executed PPA with NCEMC and the Commission

 has never before denied a certificate application where a PPA existed to demonstrate

 need. Friesian also asserts that the Commission inappropriately imposed the more

 stringent need standard for public utilities when it considered Friesian’s application

 as a merchant plant.

¶ 43 There is no indication in the record that the Commission applied the wrong

 need standard. The Commission considered Friesian’s application as a merchant

 plant pursuant to R8-63, applying the correlating need requirement for that facility

 classification. Compare Commission Rule R8-61(b) (public utilities) with Commission

 Rule R8-63(b)(3) (merchant plants).

¶ 44 In 1992, the Commission established a rule (the “Empire Power Requirement,”

 Docket No. SP-91, Sub 0), requiring a written output contract to demonstrate need

 for a facility. However, in 2001, the Commission adopted Rule R8-63(b)(3) (No. E-

 100, Sub 85), requiring that a merchant plant applying for a CPCN provide a

 “description of the need for the facility in the state and/or region, with supporting

 documentation.” In adopting the current rule, the Commission expressly overruled
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 its “Empire Power Requirement” that an applicant must submit a written contract

 for purchase of energy. Friesian contends that because it met the original, more

 stringent requirement to demonstrate need, it necessarily established need for its

 facility in this case.

¶ 45 We do not agree that the original requirement was necessarily more stringent

 than the current requirement. Rather, under the Commission’s current rule, the

 presence or absence of an existing contract is simply not dispositive of the need for a

 facility. Our General Statutes provide that before the Commission can award a

 CPCN it must consider the “applicant’s arrangement with other electric utilities for

 exchange of power, pooling of plant, purchase of power and other methods for

 providing reliable, efficient, and economical electric service.” § 62-110.1(d). By its

 own rules, the Commission may consider other factors in its need determination,

 including compliance with state or federal laws.10 That the Commission has yet to

 10 See Order Granting Certificate and Accepting Registration of New Renewable
 Facility, In the Matter of Application of Atlantic Wind, LLC, for a Certificate of Public
 Convenience and Necessity Construct a 300-Megawatt Wind Facility in Pasquotank and
 Perquimans Counties and Registration as a New Renewable Energy Facility, State of North
 Carolina Utilities Commission, Docket No. EMP-49, Sub 0 (May 3, 2011); Order Issuing
 Certificate of Public Convenience and Necessity with Conditions, In the Matter of Application
 of Duke Energy Carolinas, LLC, for a Certificate of Public Convenience and Necessity to
 Construct a 402-MW Natural Gas-Fired Combustion Turbine Generating Facility in Lincoln
 County, North Carolina, State of North Carolina Utilities Commission, Docket No. E-7, Sub
 1134 (Dec. 7, 2017); Order Granting Certificate with Conditions, In the Matter of Application
 of Duke Energy Progress, LLC, for a Certificate of Public Convenience and Necessity to
 Construct a Microgrid Solar and Battery Storage Facility in Haywood County, North
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 deny an application supported by an executed PPA makes this a case of first

 impression, but it does not establish an outright prohibition.

¶ 46 Here, relying on its past orders, the Commission applied the correct merchant

 plant need standard, affording “some weight to the existence of the PPA as a

 demonstration of need.” However, it agreed with the Public Staff that while the PPA

 demonstrates potential financial or economic viability of the project, “it is not in and

 of itself a sufficient criterion on which to base a recommendation for approval or

 disapproval of a CPCN.”

¶ 47 The record reveals the Commission considered and weighed the benefits of

 Friesian’s contract with NCEMC and Duke. Nonetheless, the Commission concluded

 the project was not in the public interest: “the cost of the Network Upgrades dwarfs

 the costs of the generating plant” and “the scale of the costs associated with the

 Facility relative to the size and projected revenue from the Facility raises concerns

 regarding economic viability of the project.” While reasonable minds may disagree

 about the Commission’s judgment call, the applicable standard of review does not

 afford this Court the authority to “second guess the Commission’s determination” in

 this regard. In re Duke Energy Corp., 232 N.C. App. at 586, 755 S.E.2d at 390.

¶ 48 NCEMC argues, in the alternative to its request for reversal, that we remand

 Carolina, State of North Carolina Utilities Commission, Docket No. E-2, Sub 1127 (Apr. 6,
 2017).
 STATE EX. REL. UTILS. COMM’N V. FRIESIAN HOLDINGS, LLC

 2022-NCCOA-32

 Opinion of the Court

 this matter to the Commission with instructions that it consider developments which

 might have occurred with the passage of time since its denial of Friesian’s application

 or that might occur in the service life of Friesian’s facility, such as the completion of

 Duke’s integrated resource plan, proposed queue reform, and additional generating

 capacity. Our review is limited to whether substantial evidence in the record before

 us supports the Commission’s decision, see § 62-94(b)(5), so we cannot consider later

 occurring developments.

 III. CONCLUSION

¶ 49 For the above reasons, we affirm the order of the Commission.

 AFFIRMED.

 Judge HAMPSON concurs.

 Judge MURPHY concurs by separate opinion.
 No. COA20-867 – State ex. rel. Utils. Comm’n v. Friesian Holdings, LLC

 MURPHY, Judge, concurring in result only.

¶ 50 Based merely upon the arguments made by Petitioner-Appellant and

 Intervenor-Appellant, I agree with the Majority’s analysis. While I have surmised

 potential winning arguments for Appellants, such arguments were not made by them

 and have not been made a part of this adversarial proceeding. This case does not

 present an issue of statutory interpretation that would necessitate our deviation from

 the basic tenet that “it is not the role of this Court to create an appeal for an appellant

 or to supplement an appellant’s brief with legal authority or arguments not contained

 therein.” Thompson v. Bass, 261 N.C. App. 285, 292, 819 S.E.2d 621, 627 (2018); disc.

 rev. denied, 822 S.E.2d 617 (2019); Wells Fargo Bank, N.A. v. Am. Nat'l Bank & Tr.

 Co., 250 N.C. App. 280, 286, 791 S.E.2d 906, 911 (2016) (“When this Court is called

 upon to interpret a statute, we must examine the text, consult the canons of statutory

 construction, and consider any relevant legislative history, regardless of whether the

 parties adequately referenced these sources of statutory construction in their briefs.

 To do otherwise would permit the parties, through omission in their briefs, to steer

 our interpretation of the law in violation of the axiomatic rule that while litigants can

 stipulate to the facts in a case, no party can stipulate to what the law is. That is for

 the court to decide.”). As a result, I would not consider our opinion today to foreclose

 future litigants from making additional or refined arguments on the issues presented

 by this case and concur in result only.